**KENTUCKY BAR ASSOCIATION,** Movant

v.

**Donald A. MAZE, Respondent.**

**No. 2012–SC–000166–KB.**

Supreme Court of Kentucky.

May 23, 2013.

## OPINION AND ORDER

The Kentucky Bar Association (KBA) charges Donald "Champ" Maze with several counts of misconduct in three separate cases, KBA File 14681, File 15241 and File 15236, all of which arise from Maze's actions prior and subsequent to the May 6, 2006 election for Bath County Attorney. The Trial Commissioner and the Office of Bar Counsel recommend permanent disbarment, whereas Maze requests and the KBA Board of Governors recommend a five-year suspension. Having reviewed the entire record, this Court finds permanent disbarment is the appropriate disciplinary sanction for Maze's misconduct. Maze, whose KBA number is 82100 and whose last known bar roster address is 115 Court Street, P.O. Box 580, Owingsville, Kentucky 40360, was admitted to the practice of law in 1987.

### KBA File 14681

After graduating from law school in 1987, Maze returned home and opened a solo practice in Owingsville, Kentucky. In 1990, Maze was elected as the Bath County Attorney and served three consecutive four-year terms until he was defeated in 2002. In 2006, Maze again ran for Bath County Attorney. The primary election that year, which was set for May 6, was rife with corruption and vote buying. According to the vote buying scheme, voting "assistors" would accompany voters into the voting booth, pay them for their vote, and then direct them to cast their ballot for particular candidates. The presence of the "assistors" was justified by the voter's alleged blindness, illiteracy or inability to operate the voting machine. Maze or others associated with him tried to persuade the Kentucky State Police to intervene but the practice continued. Eventually, Maze paid people involved in the scheme to add his name to the list of candidates for whom people were paid and directed to vote. Maze won the election and took office as Bath County Attorney on January 1, 2007.

The authorities investigated the extensive corruption surrounding the 2006 election and on September 8, 2006 Maze testified before a federal grand jury about his involvement. While under oath, Maze testified as follows:

Q: Did you give any cash, during the election process, to any of those people who were indicted?

A: No.

Q: You didn't give any cash to Norman Crouch?

A: No.

Q: You didn't give any cash to Tammy Manly?

A: No.

Q: You didn't give any cash to David Hunt?

A: No.

Q: We have heard testimony that some of these individuals, testimony from a number of people, when voting, the paid assistors as we call them, the ones who were assisting people to vote and then paying them, were voting your name along with several others as sort of a slate. Do you have any reason to know why they would be doing that? Or any explanation for the Grand Jury?

A: No, I don't.

In fact, Maze had paid people, including Manly, to add his name to the slate of candidates. Maze was soon thereafter indicted in the United States District Court for the Eastern District of Kentucky on five counts of criminal activity, including vote buying and perjury. Maze initially pled not guilty to all charges and his case proceeded to trial. Before its conclusion, however, Maze and the prosecution reached a plea agreement. On February 13, 2007, Maze pled guilty (1) to paying Tammy Manly $100.00, Annette Mitchell $100.00, David Hunt $180.00, Norman Crouch over $200.00 and paying Anthony White for votes and (2) to lying under oath to a federal grand jury. The other three charges pending against Maze were dismissed. On July 9, 2007, Maze was sentenced to twenty-one months in prison on each count, to run concurrently, followed by two years of supervised release and 200 hours of community service. He was fined $50,000.00 and assessed a criminal monetary penalty of $200.00. Maze also resigned his position as Bath County Attorney. He was released from prison on November 14, 2008 and returned home to Owingsville. Maze has paid both the fine and penalty and has completed both his supervised release and the 200 hours of community service. Since his release from prison, Maze has obtained employment selling cars and also assists his mother with various tasks.

In connection with these matters, the KBA charged Maze with violating SCR 3.130(8.3)(b) (committing criminal act that reflects adversely on honesty, trustworthiness or fitness as lawyer) and SCR 3.130(8.3)(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation). In both his Answer and in the Joint Stipulations submitted prior to the Trial Commissioner's hearing, Maze admitted he violated SCR 3.130(8.3)(b) and SCR 3.130(8.3)(c).

## KBA File 15241

At the beginning of his federal trial on the aforementioned charges, Maze copied and distributed to individuals not involved in his trial the list of the fifty to sixty people selected as prospective jurors in his trial. Among the several individuals who got a copy of this list were Paul Goodpaster, the Property Valuation Administrator for Bath County, and Charles Hart, a businessman in Bath County. Maze also later distributed the list of fourteen jurors (twelve jurors and two alternates) who were selected and empanelled to serve as his jury. Maze testified that he copied this list and made it available for people to pick up at his office. After trial had recessed one day, Maze met with Goodpaster and Hart in Goodpaster's office, at which time Hart called Cliff Davis, who was the work supervisor of juror Audie Banks.

Immediately after Maze pled guilty to buying votes and lying to a grand jury, he was questioned by the federal prosecutor about his involvement in the jury tampering, which was then under investigation. Maze testified about the phone call made to Cliff Davis as follows:

Q: Well, who was going to do it and what were they going to do?

A: I guess Chuck was going to check on the guy and probably—

Q: Probably what?

A: See if he could help, I guess.

Q: Well, that's kind of code for something, see, help you do what?

A: Well, I don't know, I mean—let me lead up to it, okay? Mr. Banks worked at a place called Kirk National Lease. It was discussed, we think, that this guy works at Kirk National Lease, this Cliff—where this Cliff is the supervisor, all right? Chuck made the phone call, asked "Does Audie Banks work there?"

This guy said, "Yeah." I didn't hear him on the other end, but he said, "Well, well—I'll get with you one day this week."

Q: I understand what was said.

A: [T]he idea was to see if this Banks guy did work there, who he was and possibly get some kind of favorable word to him some way, that—about me.

Q: Get some favorable word to him about you.

A: Right.

Four years later, when testifying before the Trial Commissioner in this disciplinary matter, Maze told a different story. He now claims he does not know why he testified the way he did in 2007 and that his sworn testimony to the federal prosecutor contained merely his guesses about what he thought might be going on. Maze now claims there was no understanding between himself, Goodpaster and Hart that Hart would call Cliff Davis about Audie Banks; that he did not know what Hart was going to do before Hart placed the call to Cliff Davis; and, in fact, that he tried to dissuade Hart from contacting anyone. Maze was never criminally charged in connection with these matters.

During Maze's criminal trial in federal court, presiding Judge Joseph Hood became aware that the jury might have been tampered with and ordered the FBI to investigate any improper conduct regarding the jury. When court recessed briefly that same day, Maze called his office and instructed his secretary to get back all of the jury information they had distributed and to dispose of it. Maze also instructed his office to call Goodpaster and inform him the FBI was investigating jury tampering.

On April 13, 2009, the KBA charged Maze with violating SCR 3.130(3.4)(a) (unlawfully obstructing another party's access to evidence by destroying a document having potential evidentiary value); SCR 3.130(5.3)(b) (make reasonable efforts to ensure the conduct of the non-lawyer over whom the lawyer has supervisory power is compatible with the professional obligations of the lawyer); SCR 3.130(3.5)(a) (influencing a judge, juror, prospective juror or other official by means prohibited by law); SCR 3.130(8.3)(b) (commit criminal act that reflects adversely on honesty, trustworthiness or fitness as lawyer); and SCR 3.130(8.3)(c) (engage in conduct involving dishonesty, fraud, deceit or misrepresentation). Maze has denied violating the Rules of Professional Conduct in this case.

### KBA File 15236

On February 14, 2007, after pleading guilty to vote buying and perjury, Maze was suspended from the practice of law by operation of Supreme Court Rule (SCR) 3.166(1), which provides for automatic suspension after conviction of a felony.[1] Maze received a letter from the Office of Bar Counsel notifying him of his suspension on March 6, 2007. Prior to events surrounding the 2006 primary election, Maze had

---

1. Suspension under this rule remains in effect until dissolved or superseded by order of the Court. Maze's suspension has not been lifted since it was imposed on February 14, 2007.

been representing Kenneth Lyons in Lyons's divorce proceedings. Lyons and his wife were able to reach an agreed settlement and Mrs. Lyons's counsel sent Maze an Agreed Order reflecting the negotiated settlement. Six days after Maze received the letter from the Office of Bar Counsel notifying him that he was suspended, he contacted Mrs. Lyons's counsel and requested she re-send the Agreed Order. Maze then signed the Agreed Order as Lyons's counsel and sent it back to opposing counsel, who filed the Order with the court.

The KBA issued a two-count charge in this matter, claiming Maze violated SCR 3.130(3.4)(c) (knowingly disobeying an obligation under the rules of a tribunal) and SCR 3.130(5.5)(a) (practicing law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction). Maze has admitted, in both his Answer and in the Joint Stipulations submitted prior to the Trial Commissioner's hearing, that he violated these rules as charged.

## Trial Commissioner's Findings and Recommendation

The hearing before the Trial Commissioner was held on March 15 and 16, 2011. After hearing testimony from several witnesses, including lengthy testimony from Maze himself, the Trial Commissioner recommended Maze be permanently disbarred from the practice of law.

In File 14681, in which Maze was charged with violating SCR 3.130(8.3)(b) and (c) in connection with his vote buying and perjury, the Trial Commissioner correctly found Maze's guilty plea conclusively proves his violation of SCR 3.130(8.3)(b) and (c). *Kentucky Bar Association v. Rice,* 229 S.W.3d 903, 904 (Ky.2007) ("Indeed, the criminal conviction itself forecloses further inquiry into whether he committed the alleged acts of misconduct."). The Trial Commissioner further found Maze failed to prove any mitigating factors and was concerned by the fact that Maze had served as the County Attorney, a trusted, respected and influential public position, for twelve years and had again been seeking that office when these offenses occurred. "Vote-buying and perjury committed by anyone, especially a member of the legal profession and one who is a public official does immeasurable damage to the public and specifically the judicial system." Commissioner's Report, p. 7. The Trial Commissioner was also particularly troubled by the fact that Maze, though admitting his guilt, repeatedly attempted to diminish the seriousness of his conduct rather than accepting full responsibility for his actions. Additionally, the Trial Commissioner found Maze's motive for buying votes and committing perjury was "not only dishonest, but also selfishly motivated to gain the financial benefits of becoming County Attorney and gain the power and influence inherent in that public office." Commissioner's Report, p. 6–7. Finally, the Trial Commissioner noted it was impossible for Maze to make restitution to those who "cast their ballot on May 6th in good faith ... or to those who voted for [Maze] with the mistaken belief he was honest, had integrity, and had knowledge of the law to competently and faithfully discharge the duties of County Attorney if elected." *Id.* at 7. Given the admitted rule violations, the nature of Maze's crimes and these aggravating factors, the Trial Commissioner recommended Maze be permanently disbarred.

In KBA File 15241, concerning Maze's involvement with the jury tampering, the Trial Commissioner found Maze violated all the rules charged by directing his secretary to destroy the juror information

sheets, which were being sought by the FBI, and by participating in the meeting with Hart and Goodpaster, in which Hart called juror Audie Banks's supervisor with the intent to improperly influence Banks. Having the benefit of observing Maze over two days of the hearing, including during Maze's lengthy testimony, the Trial Commissioner deemed Maze's claim that he had been unaware of Hart's plan to call Cliff Davis and his claim that he had opposed Hart's attempt to influence Davis to be "not credible." The Trial Commissioner was again troubled by Maze's refusal to fully admit his wrongdoing. As with vote-buying, Maze repeatedly tried to rationalize his misconduct or minimize his culpability. The Trial Commissioner found Maze's conduct "adversely reflects on his honesty, trustworthiness and fitness as a lawyer ... [his] commission of these serious crimes violates the Rules of Professional Conduct and shows a pattern of dishonesty and disregard for the judicial system and the legal profession" and accordingly recommended permanent disbarment. Commissioner's Report, p. 11, 12.

In KBA File 15236, involving Maze continuing to practice despite his suspension, the Trial Commissioner noted Maze was guilty by his own admission. While the violations in this file alone would not warrant permanent disbarment, the Trial Commissioner held, when this conduct was viewed in light of Maze's other criminal acts and violations of the Rules of Professional Conduct, permanent disbarment was the appropriate penalty. The Trial Commissioner was concerned that, yet again, Maze refused to take full responsibility for his actions.

The Trial Commissioner ultimately concluded Maze's plea of guilty to two felonies and the charges of misconduct

> clearly demonstrate a pattern of [Maze's] total disregard for the laws of the United States, the laws of the Commonwealth of Kentucky, his disrespect for the legal profession, and his reckless disregard for the truth ... [Maze's] repeated and unrepentant criminal acts against the public are like branches of immeasurable length on the tree of corruption ... they spread everywhere.

Commissioner's Report p. 14 and 15. As such, the Trial Commissioner recommended Maze be permanently disbarred from the practice of law.

## Board of Governors's Findings and Recommendation

Maze appealed the Trial Commissioner's Report and the KBA Board of Governors (the Board) heard oral arguments on January 20, 2012. The Board agreed with the Trial Commissioner that Maze is guilty of all charges of misconduct in File 14681 (concerning vote-buying and perjury) and in File 15236 (representing Lyons while suspended). In File 15241 (jury tampering), the Board, by a vote of eleven to five, found Maze guilty of violating both SCR 3.130(3.4)(a) (unlawfully obstructing another party's access to evidence by destroying a document having potential evidentiary value) and SCR 3.130(5.3)(b) (make reasonable efforts to ensure the conduct of the non-lawyer over whom the lawyer has supervisory power is compatible with the professional obligations of the lawyer); guilty, by a vote of fourteen to two, of violating SCR 3.130(3.5)(a) (influencing a judge, juror, prospective juror or other official by means prohibited by law); and not guilty, by a vote of sixteen to zero, of violating SCR 3.130(8.3)(b) (commit criminal act that reflects adversely on honesty, trustworthiness or fitness as lawyer) and SCR 3.130(8.3)(c) (engage in conduct involving dishonesty, fraud, deceit or misrepresentation). Ultimately, twelve members of the Board voted to suspend Maze for

five years and four members voted to permanently disbar Maze.

In rejecting the Trial Commissioner's recommendation to permanently disbar Maze, the Board accorded weight to (1) the fact that Maze's actions did not involve any misconduct with a client or third party's money; (2) the fact that Maze pled guilty and agreed to resign from office after only forty-five days of service; and (3) Court of Appeals Judge Sara Combs's testimony that reinstated and rehabilitated attorneys can have a positive impact on their community. The Board also relied on *Hubbard v. Kentucky Bar Association,* 66 S.W.3d 684 (Ky.2001), a case in which an attorney who had voluntarily resigned under terms of permanent disbarment after being convicted of three felonies sought and was granted reinstatement. Given these mitigating factors, the Board recommended Maze be suspended for five years.

### Proceedings Before This Court

■ This case came before the Court pursuant to SCR 3.370(7) and (8), which permits Bar Counsel to request the Court's review of the Board's decision. The findings of fact by the Trial Commissioner and the Board are advisory only. *Kentucky Bar Association v. Steiner,* 157 S.W.3d 209 (Ky.2005). The Court makes an independent review of the record and findings of fact and may "enter such orders or opinion as it deems appropriate on the entire record." SCR 3.370(7) and (8).

■ Upon review of the entire record, the Rules of Professional Conduct and relevant case law, this Court finds permanent disbarment is the appropriate sanction for Maze's misconduct. A significant factor in this Court's decision is the nature and severity of Maze's misconduct. Maze not only engaged in buying votes to get himself elected to the position of Bath County Attorney, but he then knowingly and intentionally lied under oath to a federal grand jury and later was involved with jury tampering and apparent interference with the ensuing federal investigation. Compounding Maze's misconduct is the fact that he was either running for public office or serving as the County Attorney when he committed these bad acts. As the Trial Commissioner noted, the position of County Attorney is one of power and influence that requires the trust and respect of the community, and Maze abused that good faith when he bought votes, committed perjury and tampered with a jury. Any layperson should know better, and so much more should a lawyer with over twenty years of experience, twelve of which included prosecuting criminals as the County Attorney.

The Court is also especially troubled by the fact that Maze never fully accepts sole responsibility for his actions and never expresses legitimate remorse for his misconduct. As the Trial Commissioner noted and as the transcript of evidence bears out, any time Maze would admit he had been guilty of some misconduct he would immediately attempt to mitigate or minimize his culpability. In regards to the vote buying, Maze admitted he had paid persons involved in the vote buying scheme but then explained that he had first contacted the authorities about stopping the corruption and nothing was being done, that the vote buying and corruption was rife and wide-spread and that he knew he was losing votes to his opponent and did not know what else to do. Maze also insisted he just got dragged into the whole vote buying business, that he did not consider it vote buying because he never paid the voters themselves and that he was not really thinking about buying votes when he paid the money but was just trying to get those involved in the scheme to stop badgering him for money. At one point, Maze

attempted to dismiss his behavior by saying he may not have actually received any votes as a result of his payments. At another point Maze made yet more excuses, saying yes, he *did* plead guilty, but the federal authorities involved in investigating and prosecuting the vote buying scheme pushed people to say a lot of things "to make things the way they wanted to make [them]."

Similarly, with the jury tampering, Maze claimed ignorance of the wrongfulness of distributing information about an empanelled jury to those not involved in the trial, stated people only wanted to help him out like they would any friend, that he did not know the FBI was seeking the jury information sheets, and that he only collected and destroyed those sheets to keep his friends from getting into any trouble.

In regards to practicing law while his license was suspended, Maze claimed he did not think signing an order filed with the court constituted "practicing law" and he intimated the court or opposing counsel had some obligation to object to him signing the Agreed Order.

Finally, Maze never expresses any sincere remorse for his misconduct. Maze's continued refusal to accept, without justification, full responsibility for his actions, which include the commission of several felonies, calls into question his moral fitness to continue to practice law.

In its recommendation, the KBA credited Maze with pleading guilty and with resigning his position as Bath County Attorney. The Court finds, however, that neither of these factors weighs in Maze's favor. Maze did plead guilty to his crimes but only after he was made aware of the severity and extent of the jury tampering investigation and further that, in exchange for his guilty plea, three of the five charges pending against him would be dismissed. Though Maze's resignation as County Attorney was a part of his plea agreement, it was nonetheless inevitable. Maze was immediately suspended from practice after pleading guilty and therefore could not have continued to serve as County Attorney, regardless of whether doing so was a condition of his guilty plea. Finally, the case relied on by the Board, *Hubbard,* 66 S.W.3d 684, is inapposite. That case involves the question of whether an attorney, who voluntarily resigned under terms of disbarment and therefore was eligible for future reinstatement, should in fact be reinstated to the practice of law. *Hubbard* provides no guidance on whether Maze should be disbarred for his misconduct.

There is, however, case law on point supporting permanent disbarment of Maze. The Board based its decision to only suspend Maze for five years in part on the fact that there was no financial aspect to Maze's misconduct. The Court is aware that a particularly severe stance is taken against financial misconduct by attorneys, *Rice,* 229 S.W.3d at 905, but this Court can and does disbar attorneys for non-financial misconduct. *See Kentucky Bar Association v. Geller,* 211 S.W.3d 58 (Ky.2007) (disbarred for failure to properly represent clients); *Kentucky Bar Association v. Vanmeter,* 176 S.W.3d 692 (Ky.2005) (disbarred for failure to properly represent clients and conviction of non-financial crimes); *Kentucky Bar Association v. Belker,* 997 S.W.2d 470 (Ky.1999) (disbarred for sexual misconduct with clients); *Kentucky Bar Association v. Thomas,* 999 S.W.2d 712 (Ky.1999) (disbarred upon conviction of two non-financial felonies). The fact that an attorney's misconduct does not involve financial malfeasance is not a bar to imposition of permanent disbarment.

Particularly instructive to this case is *Kentucky Bar Association v. Carmichael,* 244 S.W.3d 111 (Ky.2008), in which this

Court permanently disbarred an attorney who was convicted of attempted extortion after the attorney, who was at the time serving as a Commonwealth's Attorney, attempted to extort $50,000.00 to $100,000.00 from a man who had been recently arrested in exchange for a promise not to prosecute. Like Maze, the attorney in *Carmichael* did not have a disciplinary history, had a good reputation and had success in re-integrating himself in his community since his release from prison. Despite these mitigating factors, the Court was troubled by the fact that, also like Maze, the attorney in *Carmichael* held a position of influence and authority at the time of his misconduct. "The aggravating factor this Court does find troubling, however, is Carmichael's position of authority and influence as the elected Commonwealth's Attorney for the 28th judicial district. In the past, this Court has disbarred other public officials for abusing their office's power for their own selfish gains." *Id.* at 115 (referencing *King v. Kentucky Bar Association*, 162 S.W.3d 462 (Ky.2005) and *Kentucky Bar Association v. Layton*, 97 S.W.3d 452 (Ky.2003)).

Similarly helpful is the case office, 229 S.W.3d 903, in which the Court permanently disbarred an attorney after his conviction of two counts of false statement of identity, based on credit card identity theft perpetrated by the attorney and his girlfriend. The Trial Commissioner in *Rice* recommended a five-year suspension and, after accepting review, the Board narrowly agreed with the Trial Commissioner's recommendation (eleven members voted for a five year suspension while nine members voted for permanent disbarment). The Court in *Rice* filed a notice of review and ultimately determined permanent disbarment was the appropriate sanction. In its opinion, the Court in *Rice* listed the mitigating factors it considered, several of which are similar to those in Maze's case.

Like Maze, Rice made an effort to maintain employment since his suspension; he complied with the terms of his probation, which included community service and restitution payments; he had no prior criminal or disciplinary record; and he had engaged in no further criminal activity. Unlike Maze, Rice had expressed remorse for his wrongful conduct. Offsetting these mitigating factors was an aggravating factor the *Rice* Court found "most troubling," namely, Rice did not see any connection between his criminal conduct and his practice of law. Further concerning to the Court was Rice's initial denial of the charges, his reluctance to take responsibility for the crimes and the diagnosis of a personality disorder for which Rice had not sought treatment. With the exception of the personality disorder, these aggravating factors that the Court found compelling in *Rice* are similar to Maze's refusal to take full responsibility or express sincere remorse for his misconduct. As the Trial Commissioner found in this case, the Court in *Rice* found Rice merely "paid lip service to taking full responsibility for the crimes, throughout his questioning at the hearing he repeatedly tried to shift blame onto his then girlfriend." *Id.* at 905. Based on all of these cases/permanent disbarment is an appropriate sanction for Maze's misconduct.

The Court is aware of and has taken into consideration the mitigating factors in Maze's case. Prior to the instant case, Maze had not received any disciplinary sanctions in twenty years of practice and had no previous criminal convictions. He has been criminally punished for his illegal conduct and served his sentence without incident. He has also complied with the disciplinary authority throughout the disciplinary process. Several of Maze's friends and acquaintances testified to his good character and, present circumstances ex-

cepted, his fitness as a lawyer. These mitigating factors do not, however, outweigh the aspects of this case that justify permanent disbarment, including the nature and severity of Maze's crimes and misconduct, the fact that he was either running for or serving in public office when he committed these bad acts, the abuse of public trust and confidence and the fact that, even at this late date, Maze still refuses to fully accept responsibility or express genuine remorse for his actions. Therefore, it is hereby ORDERED:

1. Donald A. Maze is permanently disbarred from the practice of law in the Commonwealth of Kentucky; and

2. Pursuant to SCR 3.450, Donald A. Maze is directed to pay all costs associated with these disciplinary proceedings in the amount of $2,824.65.

ABRAMSON, NOBLE, and VENTERS, JJ., concur. SCOTT, J., dissents by separate opinion in which KELLER, J., joins. CUNNINGHAM, J., not sitting.

SCOTT, J., Dissenting:

For the reasons set out below, I must respectfully dissent. First, I would like to point out that this case comes to us on the motion of the KBA to sanction Maze for the same reason he was "temporarily" suspended from the practice of law more than five years ago. It does not come to us on an application for Maze's readmission; in fact, he has never applied for readmission. Even so, the KBA Board of Governors recommended that Maze be suspended from the practice of law for five years by a vote of 12–4.

Because I agree with the Board of Governors that a five year suspension is the appropriate discipline in this case, I must dissent from the majority's decision to permanently disbar Maze. While I do agree that Maze's ethical violations are serious (he gave a total of $580 to five individuals to buy votes in his election and committed perjury when questioned about it) and deserve a serious sanction, I do not believe they warrant the "death penalty" as to his ability to practice law in the Commonwealth *ever again.*

I vote as I do because I strongly disagree with the majority three major points. First, the majority relies on Maze's alleged involvement with jury tampering and apparent interference with a federal investigation. While the FBI did investigate this matter, *no such charges were ever brought against Maze.* In fact, Charles Hart, one of Maze's acquaintances who allegedly made a phone call to a juror's work supervisor, though initially convicted of attempting to influence a juror, had his conviction for this reversed by the Sixth Circuit.[2]

Secondly, the cases the majority relies upon in support of Maze's permanent disbarment are not even comparable to this case. Frankly, the majority, in its opinion, does not properly acknowledge the girth of the permanently disbarred attorneys' unethical conduct to which they have cited,

---

**2.** In a September 1, 2009 order in case number 08–5122, the Sixth Circuit reversed Hart's conviction, stating:

The undisputed testimony, however, was that, when Hart spoke with Davis, he did not refer directly or indirectly to the pending trial or to the fact that Banks was a juror. Instead, he discussed an unrelated business matter, then asked Davis "what kind of fellow" Banks was. Davis respond-

ed that Banks was "a good Christian man," and Hart ended the conversation.

... Hart did not make any statements to Davis that could be construed as even a subtle attempt to influence Banks. Accordingly, there is simply no evidence that Hart actually endeavored to influence Banks, and we reverse his conviction as to count two.

Order at 2–3.

particularly in the cases of the attorneys who were disbarred for non-financial crimes.

And, finally, the majority does not acknowledge the potential positive impact that rehabilitation plays on all parties involved. Many attorneys allowed the chance to rehabilitate their character and fitness to practice law have had subsequent positive impacts on their communities and peers.

Maze has now been suspended from the practice of law for the last five years pursuant to an interim felony suspension. An additional five-year suspension, as recommended by the Board of Governors, would mean that Maze would not practice law for a *minimum* of ten years. Furthermore, following the additional suspension, Maze would not necessarily *ever* be readmitted to the bar; rather, he would face a lengthy reinstatement process, with no guarantee of re-admission.

And, during this re-admission process, Maze would be required to: apply for re-admission arid pay the associated fees, complete the required CLE credits, retake and pass a portion of the Bar examination, be approved by the Character and Fitness Committee, and, then ultimately, face a decision from this Court as to whether he would be readmitted to the practice of law. SCR 3.510. Plainly, such a process provides an appropriate means to safeguard the profession and the public should Maze fail to adequately redeem his character and fitness to practice law within the additional five years. I simply *do not* think that the only way to provide these safeguards, at this time, is to forever strip him of his law license.

## I. JURY TAMPERING AND INTERFERENCE WITH INVESTIGATION

While Maze stipulates to the majority of the charges brought by the KBA against him, he contests those related to jury tampering and interference with a federal investigation. Moreover, I agree with him that the KBA failed to carry its burden to prove by a preponderance of the evidence that he committed the ethical violations.

The majority's decision states that Maze "was involved with jury tampering and apparent interference with the ensuing federal investigation." However, Maze *was never criminally charged* with jury tampering in spite of an FBI investigation, and an "*apparent* interference with the ensuing federal investigation" is not a strong enough nail for us to hang our robes on when considering an appropriate sanction in this case.

The KBA charges here stem from (1) the copying, dissemination, and destruction of juror sheets during Maze's criminal trial and (2) a phone call made by Charles Hart, a Bath County businessman, to juror Audie Banks's work supervisor, Cliff Davis.

Maze admits that he participated in the copying and dissemination of juror information sheets, both during jury selection and, again, once the fourteen-member panel was set. He also admits that he called a secretary in his office and instructed her to collect and destroy the juror information sheets *after* the judge in his criminal case expressed concern about their dissemination. However, he does not admit that he did any of these things for impermissible reasons. Attorneys regularly gather information on potential jurors for use in the jury selection process, and on actual jurors following their selection, in an effort to better understand the audience to whom they present their cases. There is nothing impermissible about such a practice within these limits—it occurs every day in major trials.

The KBA did not put forth evidence indicating that these juror sheets were

used for impermissible purposes. Rather, the only evidence is Maze's testimony, which indicates that he did not engage in any of these activities for impermissible reasons. Thus, in my opinion, the KBA failed to meet its burden to prove these charges by a preponderance of the evidence. SCR 3.330.

All the testimony concerning the phone call (detailed above by the majority) indicates that Hart called Davis, inquired about Banks, and indicated that he would talk to the Davis later in the week. There is nothing impermissible about that. In fact, although Charles Hart was originally convicted on the basis of this phone call, the Sixth Circuit reversed that conviction. *See* n1. While Maze was present in the room when Hart placed the call, he did not participate in the conversation. Likewise, there is no evidence that the phone call was made for any impermissible purpose.

Under our rules, the KBA bears the burden of proving their charges against Maze by a preponderance of the evidence, SCR 3.330, and, in my opinion, in this instance, they failed to do so. Again, the only evidence presented was Maze's own testimony concerning the events surrounding the call, which the trial commissioner felt to lack credibility.

## II. PERMANENT DISBARMENT CASES ARE EASILY DISTINGUISHABLE

Until 1998, we did not permanently disbar attorneys as we do now. Rather, until that time, our process was akin to the *minimum* five-year suspension advocated by the American Bar Association. Following the suspension, the "disbarred" attorneys had to go through a long and involved process to be readmitted to the practice of law, if they ever were.

While I recognize the wisdom in our current rule allowing for permanent dis-

barment in *extreme* cases of attorney misconduct, I just *do not agree that this is one of those extreme cases* meriting such a sanction. Admittedly, Maze exercised poor judgment in the months leading up to and the days following his election. However, as his many character witnesses indicated, this was not in keeping with his typical conduct. In fact, it was completely *out* of character. And, as stated, I do believe his conduct demands a harsh sanction. I do not, however, believe that it is to the benefit of anyone—not the legal community, his community in Bath County, or the public as a whole—to subject his bar license in the Commonwealth to the penalty of execution, i.e., permanent disbarment. Another five years is enough, if in fact he rehabilitates his character and fitness to practice law in that amount of time.

I believe the sanction of permanent disbarment should be reserved for extreme cases, such as stealing money from clients, other financial crimes, or such extreme non-financial crimes such as those actually cited to by the majority. For example, the attorney in *Kentucky Bar Ass'n v. Geller,* 211 S.W.3d 58, 59 (Ky.2007), had, failed to properly represent clients. However, the majority failed to mention that the attorney in that case had been disciplined on *four prior occasions.*

In *Kentucky Bar Ass'n v. Vanmeter,* 176 S.W.3d 692 (Ky.2005), the majority indicates that the attorney was disbarred for failure to properly represent clients and conviction of non-financial crimes. However, the majority again does not mention the pattern of unethical conduct in which that attorney had engaged. In fact, he had already received two private admonitions for failing to respond to bar complaints, *but yet again failed to respond* to the complaints leading to his ultimate disbarment. Clearly, he had established "a

clear pattern of noncompliance with and disobedience to the rule of law." *Id.* at 693. He had failed to appear in court to represent at least two different clients on numerous occasions and when he terminated his representation of one of these clients, he neither informed him of the termination nor returned the client's file. He was also found guilty of *six felonies:* "First Degree Perjury, Tampering with Physical Evidence, Tampering with Public Records, and three counts of Second Degree Criminal Possession of a Forged Instrument." *Id.* at 692–93.

As to *Kentucky Bar Ass'n v. Belker,* 997 S.W.2d 470, 471 (Ky.1999), the majority notes that Belker was permanently disbarred for sexual misconduct with clients, however, it *again* fails to convey the full extent and seriousness of the disbarred attorney's conduct. Belker "violated disciplinary rules seventeen times through inappropriate sexual behavior toward nine clients and potential clients." *Id.* Belker told these women, who had come to him seeking legal advice, that they had to submit to physical examinations. He then proceeded to fondle them—on *seventeen* occasions.

The majority also downplays the seriousness of the ethical violations in *Kentucky Bar Ass'n v. Thomas,* 999 S.W.2d 712 (Ky.1999), stating only that the attorney was "disbarred upon conviction of two non-financial felonies." That is a true statement. He was, in fact, convicted of two non-financial felonies. However, the majority does not mention the severity and violent nature of the two felonies: attempted murder and first-degree manslaughter.

The non-financial cases on which the majority relies are, therefore, distinguishable: (1) Maze *did not* fail to properly represent his clients, let alone do so on multiple occasions, nor does he have a history of bar discipline; (2) Maze is *not accused of any inappropriate contact* with clients, much less seventeen times over; and (3) while Maze has been convicted of two felonies, his crimes do not rise to the level of attempted murder or first-degree manslaughter.

Turning to financial crimes, the majority gives a great deal of weight to a case in which a Commonwealth's Attorney, Carmichael, was permanently disbarred following his conviction for attempted extortion. *Kentucky Bar Ass'n v. Carmichael,* 244 S.W.3d 111 (Ky.2008). Carmichael's conviction was based on his attempt to extort $50,000 to $100,000 in exchange for a promise not to prosecute a man who had recently been arrested. The majority points out that, like Maze, Carmichael had no prior disciplinary history. However, the two cases are easily distinguishable. Carmichael was abusing his position as a prosecutor for his own financial gain. Maze did not attempt to cut deals with individuals, saying that he would not prosecute them in exchange for their votes if he were elected as the county attorney. Had he done so, as in Carmichael's case, permanent disbarment would be an appropriate sanction. Maze did not "abus[e] his office's power for [his] own selfish gains" as Carmichael did. What Maze did was clearly wrong, but it does not rise to that level.

Finally, the majority cites *Kentucky Bar Ass'n v. Rice,* 229 S.W.3d 903 (Ky.2007). In that case, Rice was permanently disbarred after committing a financial crime while employed as an Assistant Fayette County Attorney. Rice and his then-girlfriend obtained two credit cards using another individual's name, birth date, and social security number. After being charged with two counts of credit card identity theft, Rice left the country (without leave to do so) while awaiting trial.

When he returned home a year later, he did not inform the court or the prosecutor of his return. As this Court stated in Rice's case, "[r]elative to this being a crime involving financial dishonesty, this Court has recently stated, our precedent is crystal clear: we treat criminal financial misconduct by attorneys very seriously." *Rice*, 229 S.W.3d at 905 (quotations and citations omitted).

I agree with the majority that permanent disbarment was appropriate in all the cases they cite in support of Maze's permanent disbarment. However, I *strongly* disagree that any of these cases are on point here. Maze did not commit financial misconduct, he did not misuse his political office for personal gain, he did not fail to properly represent clients, he did not have inappropriate sexual contact with clients, and he did not commit violent felonies such as attempted murder and manslaughter. What he did, however, does warrant a serious sanction. And, the Board of Governors realized this when recommending a suspension of an additional five years on top of the five-year temporary suspension he has already served. I think this sanction is both deserved and adequate. I also think, based on our precedent, that "permanent disbarment" in this instance without an opportunity for rehabilitation and readmission, is inappropriate.

## III. REHABILITATION

Many facets of our justice system rely on the fact that it is possible for individuals to rehabilitate themselves. It is not easy, but it is possible. People make mistakes, some worse than others. Attorneys commit ethical violations. Some, like those cited by the majority and detailed above, do so repeatedly or to such an extent that we no longer believe they are capable of rehabilitating their character and fitness to practice law. However, as I

have stated, I do not believe this is one of those cases, and I do not believe it is wise to set the precedent the majority sets today.

In saying this, I draw on several cases that exhibit the ability of lawyers to rehabilitate their character and fitness to practice law and, thus, benefit their communities and peers. These cases come before the 1998 amendment to our Supreme Court Rules which changed our "disbarment" from a temporary suspension from the practice of law to what it is now.

The majority insists that these cases have no bearing on our decision today, as these attorneys were eligible for future reinstatement under our rules as they existed at the time. I disagree. These attorneys resigned under terms of disbarment and were able to, after, among other things, proving to the Character and Fitness Committee that they possessed the appropriate character and fitness to practice law, be readmitted as members of the bar. This is the same process that Maze would be subjected to if the Court were to suspend him from the practice of law for a period of five years (as recommended by the Board of Governors) rather than permanently disbar him. Therefore, I find these cases extremely instructive.

For instance, former Kentucky State Senator, John D. Rogers resigned from the practice of law under terms of disbarment in April 1998. He had been convicted of federal charges of felony conspiracy to commit extortion, felony mail fraud, and making willful false statement to agents of the FBI (BOPTROT). *Rogers v. Kentucky Bar Ass'n*, 967 S.W.2d 583 (Ky. 1998). He was readmitted to the practice of law in the Commonwealth in 2007, nine years after his disbarment.

Former United States Congressman, Carroll Hubbard, was convicted of three felonies: one count of conspiracy to im-

pede and impair the Federal Election Commission, one count of theft of government property, and one count of obstruction of justice and resigned under terms of disbarment in 1994. *Hubbard v. Kentucky Bar Ass'n*, 878 S.W.2d 13 (1994). As we described in our 2001 opinion readmitting him to the bar, seven years after his disbarment:

> Hubbard's convictions stem from a conspiracy between Hubbard and others to transfer funds from his 1992 Congressional campaign committee, which he established for his re-election race in Western Kentucky, to his then-wife's 1992 Congressional campaign committee, which was established for her Congressional race in Eastern Kentucky. Hubbard also used his Washington D.C. Congressional staff to work on his wife's campaign. The staff members used aliases and were being paid by the federal government for the time that they spent campaigning for her in Eastern Kentucky. Hubbard admitted that the purpose of this conspiracy was to solidify support for him across the state of Kentucky in his quest to run for governor.

*Hubbard v. Kentucky Bar Ass'n*, 66 S.W.3d 684, 685 (Ky.2001); *see also Craft v. Kentucky Bar Ass'n*, 291 S.W.3d 243 (Ky.2009) (readmitted eleven years after resigning under terms of disbarment in 1998). I fully understand that Hubbard was disbarred in a time when he was eligible for reinstatement. However, his disbarment was for similar type of "political election crime" that constitute Maze's misconduct in the case at bar. In readmitting Hubbard, we noted that "[a]pplicants are to be held to a substantially more rigorous standard than a first time applicant and the proof presented must be sufficient to overcome the prior adverse judgment. The judgment of disbarment continues to be evidence against the appli-

cant and he may overcome it only by the most persuasive proof." *Id.*

This is the lofty standard that Maze would have to meet in order to be readmitted to the practice of law if we chose a five year suspension rather than permanent disbarment. If he never meets this high standard, he would never again practice law in the Commonwealth. However, it is my contention that he should be given the chance. Hope is an eternal beacon.

KELLER, J., joins.

ENTERED: May 23, 2013.

/s/ John D. Minton, Jr.
    Chief Justice